

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-15-1998

# Waldorf v. Shuta

Precedential or Non-Precedential:

Docket 97-5195,97-5222

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Waldorf v. Shuta" (1998). *1998 Decisions.* Paper 79.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/79

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 15, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-5195 and 97-5222

MARK WALDORF

        Appellant in No. 97-5195

v.

EDWARD J. SHUTA; CAROLYN WOOD; KENNETH C.
SPENCE, JR.; MARY KAY SPENCE; BOROUGH OF
KENILWORTH; JOSEPH REGO; HENRY J. MOLL; VICTOR
SMITH; LAWRENCE STICKLE; CHARLES DAVID; JOSEPH
VENTRE; THOMAS NEVILLE; WILLIAM J. AHERN;
WILLIAM E. CONRAD; LIVIO MANCINO; GARY
ROWINSKY; MARIO DIBELLA; VINCENT SCORESE;
HARRY GRAPENTHIN; MARY KELLY; RICHARD
MCCORMACK; WILLIAM HOLT; A. ZELENIAK; RICHARD
LOMAX; C. WILLIAM GUTEKUNST; FREDERICK BAILEY;
MICHAEL PADULA; CHARLES SCHEUERMANN; FRED
SUES; JOSEPH WALYUF; THOMAS MCHALE; PHILIP
ERNST; FRANK J. MASCARO; WALTER E. BORIGHT,
                JR.;
ALBERT SIMMENROTH; JAMES E. O'BRIEN; FRANK J.
JOHDOF; RAYMOND BLYDENBURGH; EDWARD
KASBARIAN; JOHN J. O'LOCK; EDMAC ENTERPRISES;
EDWARD MCDERMOTT

MARK WALDORF

v.

EDWARD J. SHUTA; CAROLYN WOOD; KENNETH C.
SPENCE, JR.; MARY KAY SPENCE; BOROUGH OF
KENILWORTH; JOSEPH REGO; HENRY J. MOLL; VICTOR
SMITH; LAWRENCE STICKLE; CHARLES DAVID; JOSEPH
VENTRE; THOMAS NEVILLE; WILLIAM J. AHERN;

WILLIAM E. CONRAD; LIVIO MANCINO; GARY
ROWINSKY; MARIO DIBELLA; VINCENT SCORESE;
HARRY GRAPENTHIN; MARY KELLY; RICHARD
MCCORMACK; WILLIAM HOLT; A. ZELENIAK; RICHARD
LOMAX; C. WILLIAM GUTEKUNST; FREDERICK BAILEY;
MICHAEL PADULA; CHARLES SCHEUERMANN; FRED
SUES; JOSEPH WALYUF; THOMAS MCHALE; PHILIP
ERNST; FRANK J. MASCARO; WALTER E. BORIGHT,
JR.;
ALBERT SIMMENROTH; JAMES E. O'BRIEN; FRANK J.
JOHDOF; RAYMOND BLYDENBURGH; EDWARD
KASBARIAN; JOHN J. O'LOCK; EDMAC ENTERPRISES;
EDWARD MCDERMOTT

BOROUGH OF KENILWORTH

        Appellant in No. 97-5222

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 84-3885)

Argued March 11, 1998

BEFORE: GREENBERG, SCIRICA, and ALDISERT,
Circuit Judges.

(Filed: April 15, 1998)

        Warren W. Wilentz
        Michael J. Barrett (argued)
        Wilentz, Goldman & Spitzer
        90 Woodbridge Center Drive
        Suite 900, Box 10
        Woodbridge, NJ 07095

         Attorneys for Appellant
        and Cross Appellee Mark Waldorf

2

Richard A. Amdur (argued)
Elizabeth A. Wilson
Amdur, Boyle & Maggs, P.C.
P.O. Box 190
Oakhurst, NJ 07755

Attorneys for Appellee and
Cross Appellant Borough of
Kenilworth

Richard M. Tango
McDermott & McGee
75 Main Street
P.O. Box 192
Millburn, NJ 07041

Attorneys for Appellees
Kenneth C. Spence, Jr.
and Mary Kay Spence

OPINION OF THE COURT

GREENBERG, Circuit Judge.

TABLE OF CONTENTS

I. FACTUAL AND PROCEDURAL HISTORY..........................4

II. JURISDICTION..........................................9
 A. District Court Determination..........................10
 B. Discussion...........................................14
  1. Finality...........................................15
  2. Just Reason for Delay..............................19

III. BINDING EFFECT OF THE STIPULATION...................20
 A. District Court Determination.........................20
  1. Prejudice to the Borough...........................21
  2. Prejudice to Waldorf...............................23
  3. Prejudice to the Judicial System ..................24
 B. Discussion...........................................25
  1. Subsequent Proceedings.............................26
  2. Manifest Injustice.................................28
  3. New Jersey Open Public Meetings Act ...............30

IV. ADEQUACY OF THE JURY VERDICT..........................33
 A. Scope of the Appellate Record........................33
 B. Pain and Suffering...................................34
 C. Award for Past and Future Economic Loss .............39
  1. Mitigation of Damages..............................39
  2. Qualification of Dennis Rizzo .....................42
  3. Remarks of Defense Counsel in Summation ...........47
  4. Improper Use of the Testimony of
        James Pascuiti...................................48
   a. Redirect Examination of Pascuiti ..................49
   b. Closing Argument by the Borough ..................49

V. COLLATERAL SOURCE SET-OFF.............................50

VI. CONCLUSION...........................................54

I. FACTUAL AND PROCEDURAL HISTORY

This case involves an appeal and a cross appeal from a judgment of $3,005,941 entered on a jury's verdict in favor of the plaintiff, Mark Waldorf, after a deduction for a collateral source recovery, in this personal injury action. Waldorf suffered injuries rendering him a quadriplegic in a motor vehicle accident in 1982 when he was 24 years old. First, Waldorf appeals from the denial of his motion for a new trial on damages and the refusal of the district court to grant him an additur as he contends that the verdict was inadequate and against the weight of the evidence. Second, Waldorf argues that he should receive a new trial based on the district court's improper qualification of a witness as an expert and based on the allegedly improper conduct of defense counsel during the trial. Defendant, Borough of Kenilworth, New Jersey ("the Borough"), contends, however, that we do not have jurisdiction over Waldorf 's appeal, because the district court has not entered a final judgment. In a cross appeal, the Borough also argues that the district court improperly bound it to a stipulation of liability to Waldorf that it made prior to an earlier trial, and that the court also erred in limiting a collateral source set-off against the jury's award. We hold that we have jurisdiction over this appeal and cross appeal and will affirm the district court's orders.

4

This appeal is the third occasion that this case has been before us during the over 13 years that it has been litigated in the federal courts. See Waldorf v. Shuta, 3 F.3d 705 (3d Cir. 1993); Waldorf v. Shuta, 896 F.2d 723 (3d Cir. 1990). Although our prior opinions relate the circumstances surrounding this case, we set forth the facts again because of their relevance to the present appeal.

On November 17, 1982, at approximately 11:45 p.m., Waldorf was involved in a two-car accident at the four-way intersection of Monroe Avenue and North 14th Street in the Borough. He was a passenger in a van driven by Kenneth C. Spence, Jr., and was riding on a seat that was not bolted down, but instead was secured only by elastic straps. Waldorf was not wearing a seat belt at the time of the accident.

The intersection of Monroe Avenue and North 14th Street had only one traffic light facing in each direction. On the night of the accident, the red light facing west at the intersection failed. Corporal Victor Smith of the Kenilworth Police Department discovered at approximately 11:00 p.m. that the red light was not working. He attempted to fix the light; but he could not repair it, nor could he switch it into the blinking mode. Smith radioed police headquarters and discussed the situation with his supervisor, Lieutenant Joseph Rego. However, instead of ordering an officer to direct traffic at the intersection, Rego assigned Smith and the other officer on duty to what he regarded as more pressing matters.

At approximately 11:45 p.m. that night, Spence was traveling south on 14th Street. Edward J. Shuta, driving a Datsun Sedan, was traveling at approximately 60 miles per hour heading east on Monroe Avenue at the same time. The green light was facing Spence, and he proceeded into the intersection at approximately 20-25 miles per hour. Shuta testified that he saw a green light when he was crossing railroad tracks 237 feet from the intersection. However, he did not see the light turn yellow, nor did he notice that the red light was not working. Thus, he entered the intersection at the same time as Spence, and the vehicles collided. The force of the collision threw Waldorf from his seat, and the bench upon which he had been sitting struck his head.

5

Waldorf was taken to Memorial Hospital in Union, New Jersey, where neurosurgeon Dr. Howard Lieberman diagnosed that he had a fracture and dislocation at the C6-C7 level of the spine with a transection of the spinal cord and a total lack of function below that level resulting in quadriplegia. See app. at 129-31. While Waldorf was at the hospital, Dr. Lieberman initially treated him with cervical traction to reduce the fracture in the cervical spine, and Dr. Lieberman later fitted him with a halo brace, which was screwed into his skull to help his neck fractures heal. Waldorf remained in the hospital for three weeks and then transferred to the Kessler Institute for Rehabilitation in West Orange, New Jersey, where he began a rehabilitation program, physical therapy, and occupational therapy.

In March 1983, Waldorf transferred to the Rusk Institute for Rehabilitation at New York University Medical Center. At Rusk, Waldorf came under the care of Dr. Kristjan Ragnarsson, a board certified physician who specializes in physical medicine and rehabilitation. Waldorf received physical therapy, occupational therapy, counseling by social workers and psychologists, vocational counseling, and therapeutic recreation. See id. at 142-50. Ultimately, Waldorf was discharged on December 23, 1983. In all, Waldorf spent 404 days at Memorial Hospital, Kessler Institute, and Rusk Institute. Upon discharge, Waldorf continued under Dr. Ragnarsson's care as an outpatient. For a time, Waldorf was under the care of Dr. Asa Ruskin, a physical medicine specialist at Kinsgbrook Jewish Medical Center, but he returned to Dr. Ragnarsson's care in April 1991, after Dr. Ruskin's death.

Waldorf 's injuries as a result of this accident are catastrophic. He has lost control of all motor, muscle, and sensory functions below the C6-C7 neurological level. Waldorf can move his facial, neck, and shoulder muscles and can raise and bend his elbow; but he cannot move his fingers. Although his chest muscles are paralyzed, he is able to breath without a respirator. Waldorf has lost a great deal of weight and muscle mass as a result of his condition. In order to combat this problem, Waldorf undergoes a 45-minute stretching and exercise program twice a day and engages in bicycle riding therapy for two hours a day. The

muscles in his legs are spastic, resulting in involuntarily contractions and motions of his legs.

Waldorf has no control over his bowel functions, which have to be stimulated artificially on a daily basis. Since 1985, he has been under the care of Dr. Joshua Feibusch, a gastroenterologist, for this problem. Furthermore, Waldorf has no control over his urinary functions, so he has to wear an external urinary collection unit. This situation has led to several urinary tract infections, one of which required a nine-day hospital stay. Among other medical problems, Waldorf suffers from autonomic dysreflexia, sexual disfunction, and musculoskeletal problems. He has had and will require 24-hour attendant care for the rest of his life. Throughout his ordeal, Waldorf has suffered from a great amount of pain.

Waldorf filed this action in the district court on September 21, 1984, against the drivers of the vehicles involved in the accident, the Borough, and various present and former Borough officials. At the first trial, which was on both liability and damages, he received a jury verdict on August 12, 1988, against the Borough, Police Lt. Rego, and the drivers of the vehicles in the amount of $8,400,000. We subsequently reversed and remanded the case for a new trial. See Waldorf, 896 F.2d at 744-45.

On remand, the Borough proposed to stipulate its liability to Waldorf in exchange for certain procedural concessions. Counsel for the Borough made this proposal at a hearing before a magistrate judge stating:

> The borough has, after much consideration and soul-searching, has authorized me to advise the Court that they will not contest liability in this matter, provided two things, and these are absolute conditions for this admission by them: One is that the case be bifurcated and different juries hear liability and damages; and the second thing is that the damages trial proceed first before a liability trial. Therefore, a decision not to contest liability is predicated on those two prerequisites.

App. at 277. Waldorf 's counsel objected to this stipulation, but the magistrate judge nevertheless incorporated the

7

stipulation by reference into an order of August 4, 1992.
See id. at 292. Pursuant to this order, the case was tried
only on damages leading to the jury returning a verdict on
September 25, 1992, for Waldorf in the amount of
$16,135,716. The Borough sought and obtained a Rule
54(b) certification of the judgment and then filed an appeal.
See Fed. R. Civ. P. 54(b). We again reversed and remanded
the case for a new trial on damages. See Waldorf , 3 F.3d at
713.

After the second remand, the Borough retained new
counsel who moved in the district court for relief from its
stipulation of liability. The district court denied the motion
and held that the stipulation bound the Borough. See
Waldorf v. Borough of Kenilworth, 878 F. Supp. 686 (D.N.J.
1995). The Borough then unsuccessfully sought permission
to appeal the decision.

The court then held a third trial, which like the second
trial, was only on damages. On October 25, 1995, the jury
returned a verdict in favor of Waldorf in the amount of
$3,086,500 divided as follows: $2,500,000 for pain and
suffering; $195,000 for past lost earnings; and $391,500 for
future lost earnings. The district court entered judgment
against the Borough on November 8, 1995, following which
Waldorf moved for a new trial on damages, or in the
alternative, for a substantial additur. The district court
denied this motion on February 26, 1996. See Waldorf v.
Shuta, 916 F. Supp. 423 (D.N.J. 1996).

Waldorf then moved for a Rule 54(b) certification for entry
of a final judgment against the Borough, and the Borough
filed a cross-motion for an order setting a date for the
liability trial. See Fed. R. Civ. P. 54(b). The Borough also
filed a motion seeking a collateral source set-off as provided
by N.J. Stat. Ann. S 59:9-2(e) (West 1992). Pursuant to Rule
54(b), the district court certified the judgment so that it
could be appealed and, by doing so, denied the Borough's
motion to set a trial date on liability. The court, however,
did not file a written opinion with its order explaining why
it entered the final judgment. As part of this same order,
the court granted in part the Borough's motion for a
collateral source set-off and reduced the judgment to
$3,005,941.

8

Waldorf then filed a timely notice of appeal, and the Borough filed a cross appeal. On December 5, 1996, we entered an order dismissing the appeals "for lack of appellate jurisdiction," citing Fed. R. Civ. P. 54(b). Waldorf filed a second motion with the district court for a certification of a final judgment pursuant to Rule 54(b). The district court subsequently issued a written opinion and order on March 24, 1997, again granting Waldorf 's certification motion. See Waldorf v. Borough of Kenilworth, 959 F. Supp. 675 (D.N.J. 1997).

On April 3, 1997, Waldorf again appealed. Kenneth C. Spence, Jr., Mary Kay Spence, Edward Shuta, and Carolyn Wood also filed notices of appeal, but they later withdrew their appeals. The Borough filed a cross appeal and, in addition, filed a motion to dismiss Waldorf 's appeal for want of jurisdiction.

II. JURISDICTION

The district court exercised jurisdiction pursuant to 28 U.S.C. S 1332(a), based on the diversity of citizenship among the parties. However, the Borough asserts that we do not have jurisdiction under 28 U.S.C. S 1291 because in its view the district court improperly certified the judgment as a final order pursuant to Rule 54(b). We will address this jurisdictional question first.

A district court's determination to grant a Rule 54(b) certification motion is "predicated on its affirmative answer to two questions, i.e., were the judgments final and were they ready for appeal." Gerardi v. Pelullo , 16 F.3d 1363, 1368 (3d Cir. 1994). In reviewing the district court's decision regarding whether a judgment is final, we exercise a plenary standard of review. See id. In this appeal, the question of finality involves the district court's interpretation of the stipulation of liability that the Borough made prior to the second trial. In reviewing the district court's interpretation of that stipulation we also exercise plenary review.1 See Washington Hosp. v. White, 889 F.2d
_____

1. Arguably this case involves construction rather than, or perhaps in addition to, interpretation of the stipulation; but as we discern no

9

1294, 1299 (3d Cir. 1989). With respect to the question of whether the issue was "ready for appeal . . . tak[ing] into account judicial administrative interests as well as the equities involved," we exercise an abuse of discretion standard of review. Gerardi, 16 F.3d at 1368 (internal quotation marks omitted). Thus, we will exercise a plenary standard of review to consider the district court's interpretation of the Borough's stipulation and the district court's determination of the finality of this judgment, but will use an abuse of discretion standard to review the district court's determination that this judgment was "ready for appeal" under Rule 54(b).

A. District Court Determination

In an opinion dated March 24, 1997, the district court certified the judgment as final under Rule 54(b) in order to permit an immediate appeal. See Waldorf, 959 F. Supp. at 682. The district court noted that following the third trial, it first had certified the judgment under Rule 54(b) without an opinion, but that we dismissed the appeal "for lack of appellate jurisdiction," citing Rule 54(b). See id. at 677–78. The district court recognized that the dismissal could imply that an appeal was not appropriate at that point in the litigation; however, the district court determined that we more likely dismissed the appeal because the court failed to state its reasons for its certification of the judgment as final. See id. at 678. Thus, having determined it would be appropriate to reconsider the certification motion in a written opinion, the court addressed its merits.

The court recognized that to certify an order pursuant to Rule 54(b), the judgment must be final and there must be no just reason for delay in entering the final judgment. With regard to the question of finality, the court held that

_____

difference in outcome turning on that distinction, as a matter of convenience we use the term "interpretation." In this regard, we are not prejudicing the Borough as we are exercising plenary review in answering all questions which could be regarded as involving either interpretation or construction of the stipulation. This standard of review is, of course, favorable to the Borough.

10

the judgment was final, because "it is an `ultimate disposition' of Waldorf 's individual claim for damages against [the] Borough." Id. at 679. The Borough had conceded its liability; and on that basis, the jury determined that Waldorf was entitled to damages from the Borough. The court also held that while the Borough claimed that it could assert the affirmative defense of comparative negligence against Waldorf, this assertion would not preclude a finding of finality; instead, the court determined that if the Borough had such a defense, it was merely a factor for the court to consider in the delay analysis and thus did not affect finality. Therefore, the court held that the judgment was final under Rule 54(b).

Having made a finding of finality, the court considered whether there was any just reason for delay. Under this analysis, courts should consider the following factors:

> (1) the presence or absence of a claim or counterc laim which could result in a set-off against the judgment sought to be made final; (2) the relationship be tween the adjudicated and unadjudicated claims; (3) the possibility that the need for review might or might not be mooted by future developments in the district court; (4) the possibility that the reviewing court might be obliged to consider the same issue a second time; and (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

Id. at 679 (citing Allis-Chalmers Corp. v. Philadelphia Elec. Co., 521 F.2d 360, 364 (3d Cir. 1975) (footnotes omitted)). With regard to the first factor, the court recognized that the existence of an affirmative defense would weigh heavily against the grant of a certification. As part of the liability trial, the Borough argued that it intended to raise an affirmative defense of comparative negligence against Waldorf. However, Waldorf claimed that the Borough waived this defense when it stipulated to liability prior to the second trial. The district court examined the circumstances surrounding the liability stipulation, and found that the Borough made no explanation at that time regarding the specific scope of the waiver nor did it express any intent to preserve any affirmative defense. See id. at 679-80. Thus,

11

these circumstances weighed in favor of finding a waiver of the comparative negligence defense.

The court also rejected the Borough's argument that its opening remarks at the second trial evidenced its intent not to waive its affirmative defense. In these remarks, counsel for the Borough stated that "[t]he Borough, in fact, has said it is at least in part responsible for this tragic event." Id. at 680. According to the Borough, this statement demonstrated that it believed that it had maintained its affirmative defense of comparative negligence against Waldorf. The court rejected this argument, noting that the statement "is consistent with the understanding that the liability phase of the trial was to treat the cross-claims asserted by the Borough against the other defendants." Id. Thus, the court held that the statement did not imply that the Borough had preserved its affirmative defense against Waldorf.

As further support for its decision, the court noted that following the second trial, the Borough was in the same procedural position in which Waldorf found himself after the third trial -- appealing under a Rule 54(b) certification on damages prior to a liability trial. Yet when the Borough appealed, it did not mention its affirmative defense and instead proceeded with its appeal. Based on all of this evidence, the court determined that the Borough's stipulation of liability precluded its assertion of an affirmative defense of comparative negligence against Waldorf.

Additionally, the court held that permitting the Borough to litigate the issue of Waldorf 's comparative negligence would "run afoul of the principles underlying New Jersey's `ultimate outcome' rule." Id. (citing Roman v. Mitchell, 413 A.2d 322 (N.J. 1980)). In Roman, the New Jersey Supreme Court held that " `a jury in a comparative negligence situation should be given an ultimate outcome charge so that its deliberations on percentages of negligence will not be had in a vacuum, or possibly based on a mistaken notion of how the [comparative negligence] statute works.' " Id. at 681 (quoting Roman, 413 A.2d at 327). Thus, in order to make an appropriate determination, a jury is entitled to know that any award to a plaintiff will be reduced by the

12

plaintiff 's negligence and, indeed, that a plaintiff 's negligence, if exceeding that of the defendant, will bar his claim entirely. The court noted that if the Borough was permitted to argue comparative negligence, "one jury will have decided the amount of Waldorf 's total damages and a second jury may quantify, by percentage, his fault." Id. The court held that the damages jury, therefore, would have operated in the vacuum that Roman sought to avoid. Based on all of these arguments, the court held that the Borough waived its affirmative defense of comparative negligence. Therefore, the first factor in determining whether there was just reason for delay, i.e., the possibility of a set-off by reason of a counterclaim, weighed in favor of certification as there was no such possibility.

In considering the second factor relating to whether there was just reason for delay in entering a final judgment, the district court found that all of the unadjudicated claims in this case addressed the issue of liability among the defendants. The Borough had conceded its liability to Waldorf, so all that remained was a determination of whether to allocate responsibility for the damages judgment among the remaining defendants. Because a certification of this judgment would not impair the Borough's right to seek contribution from the other defendants, the court held that this factor did not weigh against certification. See id. at 681.

Considering the possibility of mootness and of multiple reviews factors, the district court held that "[i]t is highly unlikely that the litigation of the Borough's cross-claims on the basis of liability would serve to moot the issue of the propriety of the jury verdict" with regard to damages. Id. Furthermore, the court recognized that another jury would not redetermine the quantum of damages so that we would address the damage issue only on this occasion. Therefore, the district court determined that these factors did not weigh against certification. See id. at 681-82.

Finally, in considering the miscellaneous factors, the district court held that the consequences of a delay in the review of this verdict weighed in favor of immediate certification and review. The court recognized that Waldorf had been injured more than 14 years earlier, and had not

13

received any compensation from this case. Without a certification, the unjustified delay would continue. The court also held that economic and solvency considerations were immaterial, determining that they played no role. See id. at 682.

Because it determined that the judgment was final and the factors weighed in favor of finding that there was no just reason for delay in the entry of a final judgment, the district court held that certification was proper under Rule 54(b).

B. Discussion

The court's authority to certify a judgment under Rule 54(b) as final creates a narrow exception to the historic policy of the federal appellate courts against piecemeal appeals. See, e.g., Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 438, 76 S.Ct. 895, 901 (1956); Braswell Shipyards, Inc. v. Beazer East, Inc., 2 F.3d 1331, 1335 (4th Cir. 1993). Rule 54(b) provides:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. . . .

Thus, to certify entry of a final judgment under this rule in a multiple claim or multiple party action, the district court must determine expressly that the judgment is final and that there is no just reason for delay.

Initially on this point we state that the district court correctly understood that we based our dismissal of the earlier appeal and cross appeal on the district court's failure to state its reasons for certification on the record. We consistently have required district courts to provide a reasoned opinion as a prerequisite for appellate review of a judgment certified as final. See, e.g., Cemar, Inc. v. Nissan Motor Corp., 897 F.2d 120, 123 (3d Cir. 1990) (dismissing

14

appeal on jurisdictional grounds because the district court did not state its reasons for certification on the record); Allis-Chalmers Corp. v. Philadelphia Elec. Co., 521 F.2d at 364 (adopting the policy of requiring a written statement of reasons by the district court in support of its determination to certify a judgment as final under Rule 54(b)). Because the district court did not provide a written opinion outlining its reasons for its first certification of the judgment, we dismissed the appeal for want of jurisdiction. As part of the second certification, however, the district court provided a written opinion explaining its reasons in great detail for granting the certification motion. Therefore, we can review the merits of the district court's certification decision.

This case involves multiple claims among multiple parties. In addition to his claim against the Borough, Waldorf has direct claims against other defendants, and the Borough has cross-claims for contribution against these same parties. See generally Owens v. Aetna Life & Cas. Co., 654 F.2d 218, 220 n.2 (3d Cir. 1981) (suggesting that contribution and indemnity claims are separate claims from the underlying complaint for purposes of a Rule 54(b) certification); Capital Transit Co. v. District of Columbia, 225 F.2d 38, 40 (D.C. Cir. 1955) ("Third party complaints seeking indemnity or contribution have in several instances been held to present a severable claim, capable of separate final adjudication under Rule 54(b) . . . ."). Thus, this case presents a situation in which a Rule 54(b) certification may be appropriate provided that in the unusual circumstances here the judgment is final and there is no just reason for delay.

1. Finality

A final judgment is "an ultimate disposition of an individual claim entered in the course of a multiple claims action." Sears, Roebuck & Co., 351 U.S. at 436, 76 S.Ct. at 900; see also Gerardi, 16 F.3d at 1638 ("Finality is defined by the requirements of 28 U.S.C. S 1291, which are generally described as `ending the litigation on the merits and leav[ing] nothing for the court to do but execute the judgment.' " (citations omitted)). Although a district court has discretion in certifying a judgment for appeal under

15

Rule 54(b) "[t]he district court cannot, in its exercise of its discretion, treat as `final' that which is not`final' within the meaning of [28 U.S.C. S] 1291." Sears, Roebuck & Co., 351 U.S. at 437, 76 S.Ct. at 900. Thus, if the Borough has retained its right to assert an affirmative defense of comparative negligence against Waldorf, the reservation would prevent a Rule 54(b) certification in this case because the judgment would not be final. See Bohl v. Stamatakis Indus., Inc. (In re Lull Corp.), 52 F.3d 787, 788-89 (8th Cir. 1995) (holding that the presence of an affirmative defense precluded a finding of finality for the purposes of a Rule 54(b) certification); see also Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Central Transp., Inc. , 935 F.2d 114, 116 (7th Cir. 1991) (holding that Rule 54(b) does not permit an "appeal when damages have been partially but not completely determined, or when the district court will revisit the issues."); Allis-Chalmers Corp., 521 F.2d at 366 ("[I]n the absence of unusual or harsh circumstances, we believe that the presence of the counterclaim, which could result in a set-off against any amounts due and owing to the plaintiff, weighs heavily against the grant of 54(b) certification.").

The concern is that if the certification is allowed a defendant will have to pay money to a plaintiff that ultimately the plaintiff could be required to return if the defendant is successful in his or her defense. In fact, the New Jersey Tort Claims Act, which is applicable to Waldorf 's claim against the Borough, provides that if a plaintiff 's negligence is greater than a defendants' negligence, the plaintiff is precluded from recovery. See N.J. Stat. Ann. S 59:9-4 (West 1992). Under this rule, depending on the outcome of the affirmative defense, an underlying judgment against the defendant could be invalidated. Thus, if the Borough can raise an affirmative defense of comparative negligence against Waldorf, the judgment from which Waldorf appeals is not final.

We hold, however, that this judgment is final because we agree with the district court's determination that the Borough waived its affirmative defense of comparative negligence as a result of its stipulation of liability prior to

16

the second trial. In interpreting a stipulation, courts should consider its plain language and "the circumstances surrounding the formation of the [s]tipulation which may explain" its meaning. Washington Hosp., 889 F.2d at 1302 (internal quotation marks omitted). The Boroughfirst proposed stipulating liability at a hearing before a magistrate judge in the context of considering a trial involving all of the defendants as to damages only. See app. at 276–77. Susan Sharko, the previous counsel for the Borough, explained to the magistrate judge that a trial limited to damages could not be held by consent because at least one defendant, Police Lt. Rego, was unwilling to stipulate to liability. See id. After this explanation, Sharko, acting for the Borough, made a clear and unequivocal stipulation of liability as to Waldorf: "The borough . . . has authorized me to advise the Court that they will not contest liability in this matter . . . ." Id. at 277. The only condition to the stipulation was that the court hold the damages trial first, to be followed by a separate liability trial. See id.

The Borough argues that the provision for the separate liability trial demonstrates that it did not waive its affirmative defense of comparative negligence as to Waldorf. This argument is without merit. The plain language of the stipulation clearly does not reserve to the Borough any right to contest liability with respect to Waldorf. The assertion of an affirmative defense of comparative negligence is inconsistent with a stipulation of liability, because the thrust of the defense is the denial of liability to the same party in whose favor the stipulation of liability runs. Furthermore, given the New Jersey law which may deny recovery to a plaintiff depending upon his percentage of comparative negligence, the stipulation necessarily had to waive this affirmative defense if it was to be a stipulation of liability. Therefore, the Borough is attempting to recast the stipulation so that it was nothing more than a stipulation that it was negligent and that its negligence was a proximate cause of the accident. Such a limited stipulation would leave the liability question open as Waldorf 's comparative negligence could bar the action.

Other persons present at the hearing when the Borough made the stipulation understood it as waiving the

17

Borough's affirmative defense of comparative negligence. In fact, while discussing the Borough's proposal, the magistrate judge stated that as a result of the stipulation, "the only rights that would accrue after [the damage trial] would be the rights between the various defendants to contribution . . . ." App. at 280; see also id. at 281 ("But in any event, Plaintiff will have 100 percent liability against the Borough, and the future liability trial, if it occurs at all, will only be to establish whether or not any one need make contribution." (comments of Steven Backfish, attorney for Police Lt. Rego)). Thus, without any objection by the Borough, the individuals involved at the hearing explained that the purpose of the liability trial would be to determine issues of contribution and not to disturb the Borough's stipulation of liability to Waldorf. Considering the circumstances surrounding the formulation of the stipulation and its plain meaning, we hold that the Borough waived its affirmative defense of comparative negligence by expressly, and without reservation, stipulating its liability to Waldorf.2

We recognize that in its cross appeal the Borough argues that the district court erred by not permitting it to withdraw its stipulation. If the Borough could free itself from the stipulation, it could contest its liability to Waldorf, because the stipulation's waiver of the affirmative defense of comparative negligence no longer would have any force. In that circumstance, arguably the judgment in this case would not be final, because the liability trial could alter or undermine completely the damages judgment. However, as we will discuss below, because we hold that the district court did not abuse its discretion in binding the Borough to its stipulation, this possibility does not prevent the judgment from being final.

The litigation between Waldorf and the Borough has been determined on the merits, and only the satisfaction of the judgment remains. The district court did not err in

_____

2. Because we hold that the Borough waived its affirmative defense, we do not reach the question of whether the assertion of that defense in a separate liability trial would violate New Jersey's ultimate outcome rule. See Roman, 413 A.2d at 327.

18

determining that the stipulation waived the Borough's affirmative defense of comparative negligence and, as we will discuss below, the court did not abuse its discretion in preventing the Borough from withdrawing the stipulation. Therefore, the judgment in this case is final.

2. Just Reason for Delay

In considering whether there is any just reason to delay entry of a final judgment, " `the proper role for the court of appeals is not to reweigh the equities or reassess the facts but to make sure that the conclusions derived from these weighings and assessments are judicially sound and supported by the record.' " Cemar Corp. , 897 F.2d at 123 (citing Curtiss-Wright v. General Elec. Co., 446 U.S. 1, 10, 100 S.Ct. 1460, 1466 (1980)). We hold that the district court did not abuse its discretion in determining that there was no just reason to delay entry of a final judgment or to delay this appeal. When the court made its determination, Waldorf had endured three trials and two appeals and had waited more than 14 years without receiving any compensation for his injuries from this case. Any subsequent trial will not concern the issues of damages that have been fixed by the judgment; particularly inasmuch as we understand that all the parties agree that they are bound by the judgment with respect to the extent of damages. Thus, there is no risk that the issues decided at the damages trial will be reconsidered or that the damages determination will be moot.3 Furthermore, the Borough does not have any pending counterclaims or defenses against Waldorf that could reduce the award. The district court properly examined all the appropriate factors under our test as set forth in Allis-Chalmers  and did not abuse its discretion in determining that they weighed in favor of certifying the judgment as final thus allowing an immediate appeal.

_____

3. In the circumstances, we see no reason to enter into a discussion of the preclusive effect of the judgment on parties other than Waldorf and the Borough. We simply note that it is not conceivable that any defendant would want to retry the damages issue and that Waldorf has had a full and fair trial on damages.

19

Based on the foregoing reasons, we will affirm the district court's determination to certify this judgment asfinal pursuant to Rule 54(b). Therefore, we have jurisdiction and we now turn to the merits of Waldorf 's appeal and the Borough's cross appeal.

III. BINDING EFFECT OF THE STIPULATION

Although we typically would consider issues raised by an appellant before considering arguments raised by a cross appellant, we first will consider the issue the Borough raises in its cross appeal that its stipulation of liability is not binding. We reverse our usual order because of the significance of the issue on our jurisdiction, reference to which we made above. In its cross appeal, the Borough challenges the district court's decision precluding it from withdrawing its stipulation of liability to Waldorf. On this appeal and cross appeal, the Borough seeks to maintain the damage verdict but free itself of its full admission of liability to Waldorf. Thus, even though part of the condition of the stipulation has been carried out, the holding of a damage trial first by a separate jury, the Borough wishes to withdraw from its concession of liability to Waldorf and require that there be a full liability trial. Thus, to put it bluntly, the Borough wants it both ways -- the stipulation will be applied but only insofar as it is in its interest to apply it.

As we have indicated, if the Borough is correct in its argument, the possibility of a reduction or elimination of the judgment in this case that could result from a full liability trial arguably might deny us jurisdiction over this appeal, because the judgment from which Waldorf appeals might not be regarded as final. Thus, the merits of the cross appeal and the jurisdictional issues are intertwined. We, however, will affirm the district court's denial of the Borough's motion to relieve it from the stipulation. Thus, our jurisdiction is secure.

A. District Court Determination

As we have indicated, the Borough unsuccessfully sought to withdraw its stipulation of liability to Waldorf prior to the

third trial. See Waldorf, 878 F. Supp. at 696. The district court held that a party may avoid a stipulation in three circumstances: mistake of law, express limitation, and manifest injustice. First, the court held that if a stipulation was entered into as a result of a mistake of law, a party should be entitled to relief. However, the court held that the Borough's decision to make the stipulation was merely tactical, rather than being engendered by a mistake of law. See id. at 692. Second, the court held that a party could be relieved of a stipulation if the stipulation expressly was limited "to a single trial and [was] phrased in conclusory, rather than evidentiary facts." Id. at 691-92. Examining the stipulation, the court held that the Borough did not limit the stipulation to a single trial, nor was the stipulation intended merely to narrow the issues in dispute. Rather, the court found that the Borough entered into the stipulation "as a tactical decision that the amount of damages awarded to Waldorf, if any, would be of a lesser quantum if the jury awarding the damages was not aware of the Borough's actions leading to its liability." Id. Therefore, the court held that the express limitation exception did not apply to the Borough's stipulation. Turning to the third exception, the court noted that "it is well-settled by decisional law in this and other circuits that a stipulation remains in effect unless the trial court finds that such vitality would result in `manifest injustice.' " Id. at 690 (citations omitted). The court also stressed that district courts are given broad discretion to determine when there would be such injustice. See id. at 691. To determine whether there was manifest injustice in this case, the court examined the prejudice issue from the perspectives of the Borough, Waldorf, and the court.

1. Prejudice to the Borough

In determining whether the Borough would be prejudiced by binding it to its stipulation of liability, the court confronted the Borough's argument that "recently-reviewed evidence could negate the Borough's liability to Waldorf " on three different bases; thus, according to the Borough binding it to its stipulation would result in manifest injustice. Id. at 692-93.

21

The first evidence concerned Waldorf 's contention that the traffic light at the intersection of the accident was illegal when the Borough constructed it because it did not have two light "faces" in each direction as required by the Manual on Traffic Control Devices for Streets and Highways (June 1961) ("the 1961 Manual"). The State of New Jersey adopted the 1961 Manual on January 2, 1962. Based on "recently reviewed evidence," the Borough alleged that it could establish that the light was not illegal when it was constructed, because the 1961 Manual did not become binding on municipalities until September 1964, which was after the Borough constructed the light. To support this claim, the Borough produced a letter dated September 15, 1964, from Gerald J. Driscoll, Chief of the Traffic Safety Service of the New Jersey Division of Motor Vehicles, which stated that "[a]s of this date, the Director of Motor Vehicles will process municipal applications for traffic signals . . . in accordance with the procedures described in the New Jersey Manual on Traffic Signal Application Procedures for Local Officials [`the New Jersey Manual'] .. . ." Id. at 693. According to the Borough, this letter evidenced that the 1961 Manual was not in effect prior to September 1964. The district court rejected this interpretation because the New Jersey Manual cited in the letter differed from the 1961 Manual which was at issue in this case. Thus, because the manuals are distinct, the court held that the Borough could not be prejudiced by the exclusion of this evidence.

The Borough also claimed that it could produce evidence which would refute two other theories Waldorf advanced to establish its liability: that it failed to have a preventive maintenance plan that would have prevented the accident and that it failed to equip its police cars with emergency signs that would warn motorists of a malfunctioning traffic light. Under these theories, if the Borough had decided as an act of discretion not to adopt such a plan or purchase such signs, the Borough would be immune from liability under N.J. Stat. Ann. S 59:2-3(c) (West 1992). However, if the Borough simply failed to consider adopting the plans or purchasing the signs, then it could not assert an immunity defense. See Waldorf, 896 F.2d at 730, 737. In support of its motion to be relieved from the stipulation, the Borough

22

argued that it could produce testimony from a former Borough official that the Borough had considered both issues, but in the exercise of discretion, decided not to implement a preventive maintenance plan or purchase emergency warning signs. The court, however, noted that the Borough did not provide an affidavit of this unnamed official giving even "the barest outline of what that testimony might be" nor did the Borough explain why it did not offer this testimony at the original trial which included liability issues. Waldorf, 878 F. Supp. at 693-94. Therefore, the court held that the rejection of this evidence would not harm the Borough. Because the court determined that none of the recently reviewed evidence would undermine the Borough's stipulation of liability, the court held that binding the Borough to its stipulation would not result in a manifest injustice.

Furthermore, the court noted that the Borough had not demonstrated that it exercised due diligence in advancing this "recently reviewed evidence." The court compared the situation to the granting of a new trial under Fed. R. Civ. P. 60. Under that rule, a court may relieve a party from a final judgment or order based on "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b). While the Borough was not moving for a new trial, the court held that the situations were similar: new trial counsel for the Borough raised the issue of "new" evidence which the Borough's previous counsel did not discuss or bring forth. Furthermore, the Borough offered no explanation as to why this evidence could not have been presented during the first trial. Therefore, the court determined that because the Borough had failed to exercise due diligence with respect to this evidence, it should not be permitted to withdraw its stipulation. See Waldorf, 878 F. Supp. at 694.

2. Prejudice to Waldorf

In considering the impact of a withdrawal of the stipulation on Waldorf, the court held that Waldorf would suffer prejudice if the court granted the Borough's motion. The court noted that liability had not been an issue in the

case since the Borough made the stipulation in 1992. See id. at 694. If there was a trial on liability, there would be further delays in the case, because Waldorf would have to determine the availability of witnesses and marshal the evidence that pertained to an issue which the parties had not contested for years. Thus, the court held that relieving the Borough from its stipulation would prejudice Waldorf. See id.

3. Prejudice to the Judicial System

Finally, the court held that judicial resources would be burdened unduly if the Borough was permitted to withdraw its stipulation. The court stated that granting the motion would compromise the integrity of the judicial process, because the Borough then could take the case in a different direction merely because its new counsel might have tried the case differently than the previous counsel if he had been present at the outset of the case. The court recognized that concerns of judicial integrity underlie the doctrine of judicial estoppel; this doctrine precludes a party from asserting a position in a proceeding that is inconsistent with a previously asserted position. See id. at 695 (citing Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107 (3d Cir. 1992)). Based on these concerns of consistency and judicial integrity, the court held that allowing the Borough to chart a new path would prejudice the judicial system. [4]

Based on the consideration of all of the possible prejudice to the Borough, Waldorf, and the court, the district court held that binding the Borough to its stipulation would not

_____

[4]. The court also held that permitting the Borough to withdraw the stipulation would violate the law of the case doctrine and the mandate rule. Under the law of the case doctrine, once an issue has been decided, parties may not relitigate that issue in the same case. Here, the court held that the stipulation itself determined the issue of liability and removed that issue from judicial consideration. Furthermore, the court determined that our mandate in vacating the second judgment remanded the case "for a new trial on damages." Id. According to the district court,
permitting the parties to litigate an issue beyond damages would violate the mandate. Thus, these alternative bases provided support for binding the Borough to its stipulation.

24

result in a manifest injustice. See id. at 696. Thus, because there was no reason to free the Borough from its stipulation, the court denied the Borough's motion to 771<!>withdraw its stipulation of liability to Waldorf.

Subsequently, but still before the damages trial, the Borough moved for relief from the stipulation on the grounds that it had authorized the stipulation in violation of the New Jersey Open Public Meetings Act ("the Act"), N.J. Stat. Ann. SS10:4-6 et seq. (West 1993). The district court denied this motion without opinion by order of August 31, 1995.

B. Discussion

We review a district court's decision to bind a party to its stipulation under an abuse of discretion standard. See Wheeler v. John Deere Co., 935 F.2d 1090, 1098 (10th Cir. 1991). In general, courts encourage parties to enter into stipulations to promote judicial economy by narrowing the issues in dispute during litigation. See TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995). Allowing parties easily to set aside or modify stipulations would defeat this purpose, wasting judicial resources and undermining future confidence in such agreements. Thus, "[i]t is a well-recognized rule of law that valid stipulations entered into freely and fairly, and approved by the court, should not be lightly set aside." Kohn v. American Metal Climax, Inc., 458 F.2d 255, 307 (3d Cir. 1972), partially overruled on other grounds en banc by Kershner v. Mazurkiewicz, 670 F.2d 440, 448 (3d Cir. 1982). However, in spite of the severe limitations placed on withdrawing stipulations, they are not absolute, and courts can grant parties relief from them. See, e.g., United States v. Montgomery, 620 F.2d 753, 757 (10th Cir. 1980).

In support of its argument that the district court should have relieved it from the stipulation, the Borough advances three main contentions: (1) because the stipulation was conclusory in nature rather than factual, it was not binding on retrial; (2) manifest injustice would result if the court binds the Borough to its stipulation; and (3) the stipulation is invalid, because its authorization by the Borough violated the New Jersey Open Public Meetings Act. See N.J. Stat.

25

Ann. SS 10:4-6 et seq. (West 1993). We will address each argument in turn.

1. Subsequent Proceedings

Generally, a stipulation entered into prior to a trial remains binding during subsequent proceedings between the parties. See, e.g., Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1547-48 (9th Cir. 1987) (binding parties to a stipulation on retrial); United States v. Boothman, 654 F.2d 700, 703 (10th Cir. 1981) (same); United States v. Marino, 617 F.2d 76, 82 (5th Cir. 1980) (same). However, a stipulation does not continue to bind the parties if they expressly limited it to thefirst proceeding or if the parties intended the stipulation to apply only at the first trial. See Vattier v. Hinde, 32 U.S. 252, 266 (1833) (binding the parties upon remand of the case to an agreement consenting to the admission of certain testimony made prior to the reversal of the initial verdict, because the consent was not limited expressly); Hunt v. Marchetti, 824 F.2d 916, 917 (11th Cir. 1987) (upholding the district court's withdrawal of a stipulation, because the district court determined that the parties intended to limit the stipulation to the first trial); United States v. Burkhead, 646 F.2d 1283, 1285 (8th Cir. 1981) (binding the parties to a stipulation because it "was not by its terms limited to use in the first trial").

In this case, the stipulation was unilateral as Waldorf objected to it. Yet, we conclude that the cases involving agreements are persuasive here. After all, we see no reason why the Borough's position should be stronger because the court at its request imposed the stipulation on Waldorf than it would be if the parties had agreed on the stipulation.

The Borough did not limit its stipulation to the trial then at hand. Instead, counsel for the Borough made a clear and unequivocal statement conceding its liability to Waldorf: "The borough has, after much consideration and soul-searching, has authorized me to advise the Court that they will not contest liability in this matter . . . ." App. at 277. Thus, rather than limiting the stipulation to the ensuing

26

trial, the Borough made an open-ended concession of liability. In an attempt to counter the lack of any limiting language contained in the stipulation, the Borough focuses on the nature of the stipulation itself. According to the Borough, because the stipulation was conclusory in nature rather than factual, it should apply only to the prior proceeding.

While conclusory stipulations are entitled to less deference than evidentiary ones, see Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1369 (5th Cir. 1983), the Borough's focus only on the nature of the stipulation is misplaced; limiting language or the intent to limit the agreement is also an important factor in considering the effect of a stipulation. For instance, Hunt v. Marchetti was a libel suit involving a newspaper that had published an article stating that the Central Intelligence Agency would implicate E. Howard Hunt in the 1963 assassination of President John F. Kennedy. See 824 F.2d at 916–17. Prior to the first trial between the parties, Liberty Lobby, the publisher of the newspaper, made a conclusory stipulation that it would not attempt to prove that Hunt was in Dallas, Texas, on the day of the assassination. See id. at 917. After the completion of the first trial, the Court of Appeals for the Eleventh Circuit reversed the judgment and remanded the case for a new trial. See Hunt v. Liberty Lobby , 720 F.2d 631 (11th Cir. 1983). Prior to this new trial, the district court ruled that the stipulation applied only at the first trial; and therefore, it would not bind the parties during the retrial of the case. See Hunt, 824 F.2d at 917. The critical factor for the district court in making this determination was not the conclusory nature of the stipulation, but rather the intent of parties to limit the stipulation to the first trial. See id. at 918. On further appeal, the court of appeals held that the district court did not abuse its discretion in making this determination. See id. at 918; see also Wheeler, 935 F.2d at 1098 (holding that a district court may release a party from a conclusory stipulation if the stipulation is "limited expressly to a single trial").

Thus, while a court might be more inclined to free a party from a conclusory stipulation than a factual one, the parties' intention to limit or not limit a stipulation to only

27

one proceeding is the overriding factor. In this case, based on the explicit language of the Borough's stipulation, the district court determined that the Borough did not intend the stipulation to apply only to the first trial. See Waldorf, 878 F. Supp. at 692. We will not disturb this finding, because we cannot say that the district court abused its discretion in making that determination, and even exercising plenary review we would reach the same conclusion.

2. Manifest Injustice

We now turn to the Borough's second argument, that "[i]n exceptional circumstances," courts will free a party from a stipulation to prevent a manifest injustice. Kohn, 458 F.2d at 307; see also TI Fed. Credit Union , 72 F.3d at 928. In determining whether there will be manifest injustice unless a party is relieved from a stipulation, courts have focused on such factors as: (1) the effect of the stipulation on the party seeking to withdraw the stipulation, see Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1206 (7th Cir. 1989) (discussing the effect of the stipulation on the party seeking to withdraw the agreement); (2) the effect on the other parties to the litigation, see Logan Lumber Co. v. Commissioner, 365 F.2d 846, 855 (5th Cir. 1966) (holding that "suitable protective terms or conditions" should be imposed "to prevent substantial and real harm to the adversary" (citations omitted)); (3) the occurrence of intervening events since the parties agreed to the stipulation, see Bail Bonds by Marvin Nelson, Inc., 820 F.2d at 1548 (denying relief from a stipulation because"nothing subsequently occurred to change the effect of the original stipulation"); and (4) whether evidence contrary to the stipulation is substantial, see Donovan v. Hamm's Drive Inn, 661 F.2d 316, 317 (5th Cir. 1981) (holding that a court could relieve a party from a stipulation upon a showing of substantial contrary evidence).

In arguing that manifest injustice will result if it is not relieved from the stipulation, the Borough cites"recently reviewed evidence" that allegedly undermines a conclusion that the Borough is liable to Waldorf. Waldorf , 878 F. Supp. at 693. However, we cannot say that the district court

28

abused its discretion in determining that this evidence is insufficient to establish that a manifest injustice would result if the stipulation continued to bind the Borough. The Borough does not claim that the evidence is the product of an intervening event or that it previously could not have discovered the evidence. Instead, as the district court stated: "[The Borough] seeks to offer evidence that probably has been available to it since the time of the first trial." Id. at 694. Thus, this case does not involve circumstances that have changed dramatically so as to warrant granting it relief from the stipulation.

Furthermore, the Borough's evidence itself affords no basis for granting it relief from the stipulation. The 1964 Driscoll letter relates only tangentially to this case, because it does not address directly the 1961 Manual containing the set of regulations at issue in this case. After considering the Borough's arguments that the district court erred in its interpretation of the letter, we hold that the district court did not abuse its discretion in determining that the letter did not provide any proof that the 1961 Manual had not been adopted prior to the Borough's installing the traffic light at the site of Waldorf 's accident. The Borough's argument is premised only on a brief mention of the 1961 Manual in the later manual, the New Jersey Manual, discussed in the 1964 letter. This mention does not undermine Waldorf 's premise that New Jersey adopted the 1961 Manual almost three years prior to the 1964 letter.

Additionally, the Borough did not present any evidence or affidavits to the court to support its motion with regard to the other challenges to its liability. Based on this lack of relevant evidence, the district court did not abuse its discretion in rejecting those arguments as a basis to overturn the stipulation. As the party seeking to free itself from the stipulation, the Borough had the obligation to provide the district court with competent evidence of the manifest injustice to it from binding it to the stipulation.

When the Borough made the stipulation prior to the second trial, it had a full understanding of the legal rights it was relinquishing, and had clear knowledge of the consequences of its stipulation. In light of these circumstances, we cannot say that the district court

abused its discretion in determining that the evidence the Borough cited did not support a finding of manifest injustice.

We also note that on this appeal the Borough seeks to free itself only from a portion of the stipulation. The Borough wishes to maintain the division of the trial into damage and liability phases with separate juries. Moreover, of course, it seeks to uphold the damages verdict that is the subject of this appeal. It undoubtedly believes, as would any reasonable person, that the verdict was favorable to it.

Accordingly, of all of the conditions in the stipulation, the Borough wants to eliminate only its admission of liability to Waldorf. As the district court correctly noted,"the Borough made the stipulation as a tactical decision that the amount of damages awarded to Waldorf, if any, would be of a lesser quantum if the jury awarding the damages was not aware of the Borough's actions leading to its liability." Id. at 692. Having received what it conceived (probably correctly) was the advantage of a separate trial on damages, the Borough now seeks to withdraw the damaging part of the stipulation -- its admission of liability. However, a party may not be freed of the burdens of a stipulation while maintaining its benefits. See Kohn, 458 F.2d at 307 ("[W]here a stipulation has more than one material part, one such portion may not be deleted and the remainder of the stipulation enforced."); Emerick & Duncan Co. v. Hascy, 146 F. 688, 695 (9th Cir. 1906); 73 Am. Jur. 2d Stipulations S 13 at 549 (1974). If we freed the Borough from the concession of liability aspects of the stipulation, we would be manifestly unfair to Waldorf.

3. New Jersey Open Public Meetings Act

Finally, the Borough argues that it should not be bound by the stipulation, because the Borough granted its attorney the right to make the stipulation in a proceeding held in violation of the New Jersey Open Public Meetings Act. This Act provides that, with exceptions, "all meetings of public bodies shall be open to the public at all times. Nothing in this act shall be construed to limit the discretion of the public body to permit, prohibit or regulate the act of participation of the public at any meeting." N.J. Stat. Ann.

30

S 10:4-12(a) (West 1993). Among these discretionary decisions specifically listed in the statute, the Act provides that the public may be excluded from discussions regarding pending litigation or involving the attorney-client privilege. See N.J. Stat. Ann. S 10:4-12b(7) (West 1993). However, for the public to be excluded, the public body first must adopt a resolution at a public meeting "(a) [s]tating the general nature of the subject to be discussed; and (b) [s]tating as precisely as possible, the time when and the circumstances under which the discussion conducted in closed session of the public body can be disclosed to the public." N.J. Stat. Ann. S 10:4-13 (West 1993). In this case, the Borough had discussions regarding the stipulation and ultimately voted to agree to the stipulation at a closed meeting. See app. at 294. However, the Borough never adopted a resolution as provided under section 10:4-13, nor has it subsequently ratified the agreement in any of its open meetings. Therefore, the Borough argues that it authorized the stipulation in violation of the Act.

Because our determination on this issue involves construction of the Act, we exercise plenary review. See, e.g., Smith v. Magras, 124 F.3d 457, 460 (3d Cir. 1997). We hold that the Borough has waived any challenge it might have had under the Act.5 Section 10:4-15a of the Act (emphasis added) provides that:

> Any action taken by a public body at a meeting which
> does not conform with the provisions of this act shall
> be voidable in a proceeding in lieu of prerogative writ in
> the Superior Court, which proceeding may be brought
> by any person within 45 days after the action sought
> to be voided has been made public . . . .

The New Jersey courts have enforced this 45-day time limit strictly. See, e.g., Township of Bernards v. State Dep't of
_____

5. Waldorf contends that this Act provides a cause of action only to citizens and not municipalities, because the Act was intended to provide citizens with full access to all public meetings of governmental bodies and to protect against secrecy in public affairs. See N.J. Stat. Ann. S 10:4-7 (West 1993). Because we hold that the Borough has waived any possible challenge under the Act, we need not reach the question of whether the Borough can maintain a challenge under the Act.

31

Community Affairs, 558 A.2d 1, 13 (N.J. Super. Ct. App. Div. 1989) (denying a challenge as untimely when it was filed nine months after the release of the minutes of a closed meeting); Jersey City v. State Dep't of Envtl. Protection, 545 A.2d 774, 783 (N.J. Super. Ct. App. Div. 1988) (denying a challenge when the action was filed 60 days after the public release of the information). The 45-day time limit of section 10:4-15a is mandatory; because the Borough did not challenge the approval of the stipulation within this 45-day time limit, its complaint is barred.6

Based on the foregoing reasons, we hold that the district court did not abuse its discretion in binding the Borough to its prior stipulation. Indeed, we think that the Borough advances the Open Public Meeting Act argument with ill grace. Does the Borough believe that Waldorf and his counsel should have investigated to make sure that the Borough followed proper procedures when it tendered its stipulation?

Moreover, the Borough's position now is fundamentally different from the position it took before the district court. The Borough initially sought relief from the stipulation prior to the third trial. If it had been successful then, the case would have been tried on all issues, and it would have lost the advantage of the stipulation. However, before this court, the Borough asks us to affirm the damages judgment and only void the stipulation as it relates to the liability trial. Thus, having received the benefit from its allegedly illegal conduct, the Borough only seeks to avoid the disadvantages resulting from that same conduct.

We must say that we are disturbed by the Borough's argument for we do not subscribe to the theory that in litigation anything goes. The Borough remains bound to its

_____

6. Even if we held that the 45-day limit could be relaxed in some circumstances, we would not relax it here. In this regard, we point out that the Borough was not in the position of an unknowing outsider unaware that an action had been taken. Moreover, it waited for years before it ever invoked the Act. In Jersey City , the court indicated that with respect to the 45-day time limitation "[c]onstructive notice is the standard." 545 A.2d at 783. The Borough, of course, had actual notice of its allegedly illegal conduct at the time of the violation.

admission of liability and the bifurcation of the trial. Thus, because the Borough's liability to Waldorf remainsfixed, the Borough's contention that it should be relieved from the stipulation of liability does not affect our jurisdiction over the present appeal.7

IV. ADEQUACY OF THE JURY VERDICT

A. Scope of the Appellate Record

As a preliminary matter, Waldorf asks us to lodge a set of videotapes presented to the district court in the appellate record. One videotape depicts a day in Waldorf 's life during his stay at the Kessler Institute in 1983, and the second videotape depicts Waldorf undergoing one of his exercise regimens. Counsel for Waldorf showed these videotapes to the jury during trial, and he contends that they are relevant to our determination regarding the adequacy of the jury's verdict. We will grant Waldorf 's request and include these videotapes in the appellate record.

The Federal Rules of Appellate Procedure provide that the record on appeal should consist of: "The original papers and exhibits filed in the district court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the district court . . . ." Fed. R. App. P. 10(a). This definition not only includes items admitted into evidence, but also includes items presented to the district court and not admitted into evidence. See United States v. Burke, 781 F.2d 1234, 1246 (7th Cir. 1986). The basic purpose behind the rule is to prevent parties from supplementing the record on appeal with items never presented to the district court. See 16A Charles Alan Wright et al., Federal Practice and Procedure S 3956.1 (2d ed. 1996).

_____

7. Of course, there are other problems with the Borough's position, such as judicial estoppel. Moreover, the Borough might have obtained a result at the second trial which it found satisfactory and it therefore never may have sought to avoid the stipulation. We also point out that if we had required the vacation of the stipulation, we might have ordered a new trial on damages.

Waldorf 's videotapes should be included in the appellate record, because he presented them to the district court and the jury saw them. See United States v. Sanchez–Valderuten, 11 F.3d 985, 987 (10th Cir. 1993) (holding that a videotape introduced into evidence was part of record on appeal); Graham v. Hoke, 946 F.2d 982, 997 (2d Cir. 1991) (holding that a videotape shown to the jury and part of the district court record properly was considered to be part of the appellate record). Furthermore, these videotapes are especially relevant to the issues we are deciding, because they bear upon the sufficiency of the evidence supporting the verdict, which Waldorf believes is inadequate. See LaFollette v. Savage, 63 F.3d 540, 544 (7th Cir. 1995), opinion supplemented by, 68 F.3d 156 (7th Cir. 1995). Therefore, we include these videotapes as part of the record of this appeal.

B. Pain and Suffering

Waldorf challenges the jury award of $2,500,000 for his pain and suffering as inadequate and against the weight of the evidence. In its opinion of February 26, 1996, the district court determined that the jury's award was adequate on its face, and thus Waldorf was not entitled to a new trial. See Waldorf, 916 F. Supp. at 426–29. The court found "no evidence that the jury was swayed by any passion or prejudice that might have made it disregard the weight of the evidence." Id, at 426. The court also recognized that the jury had an adequate opportunity to consider the size of the award through the testimony of Waldorf and his doctors, the jurors' observation of Waldorf, and the arguments of his counsel.

The court then compared Waldorf 's pain and suffering verdict to verdicts in similar cases to gauge further its adequacy. The court first distinguished three cases Waldorf cited involving jury verdicts of over $10,000,000 for allegedly similar injuries: Fleck v. KDI Sylvan Pools, Inc., 1991 WL 261659 (E.D. Pa. Dec. 6, 1991), aff 'd in part, rev'd in part, 981 F.2d 107 (3d Cir. 1992) (award of $10,000,000); Harrigan v. Ford Motor Co., 406 N.W.2d 917 (Mich. Ct. App. 1987) (award of $12,000,000); Firestone v. Crown-Center Redevelopment Corp., 693 S.W.2d 99 (Mo.

34

1985) (award of $15,000,000). The court then discussed numerous similar cases with verdicts ranging from $1,000,000 to $3,510,000 for pain and suffering damages. See Waldorf, 916 F. Supp. at 427-29. Because the award to Waldorf was well within this range, the court determined that the jury award was not inadequate on its face, contrary to the evidence, or so low that it shocked the conscience of the court. Thus, the court denied Waldorf 's motion for a new trial based on the asserted inadequacy of the pain and suffering damages.

We review a district court's grant or denial of a motion for a new trial for an abuse of discretion. See Cooper Distrib. Co. v. Amana Refrigerator, Inc., 63 F.3d 262, 277 (3d Cir. 1995). We will reverse a denial of a new trial only when "the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent a miscarriage of justice." Id.; see also Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989) ("For the court to disturb a jury verdict, `the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court.' " (citations omitted)).

Waldorf was 24 years old at the time of his accident with a statistical life expectancy (aside from the effects of his injuries) of 52.67 years. However, because of his medical problems, his life expectancy is ten percent less than that of an average person. The jury heard much testimony regarding the results of the devastating accident on Waldorf: the 404 days in several hospitals and institutions; the halo brace screwed into his skull for five months; the extensive paralysis; the long and difficult rehabilitation; his constant pain; the required 24-hour attendant care for the rest of his life; and the medical problems from which he will suffer for the rest of his life such as muscle atrophy, neurogenic bladder, urinary tract infections, neurogenic bowel, sexual dysfunction, and muscle spasticity.

Nevertheless, in challenging the verdict for pain and suffering, Waldorf does not cite to any specific indication that the jury disregarded the evidence. Instead, he relies on the size of the award as evidence of jury misconduct. However, juries are afforded broad discretion and great leeway in fixing fair and reasonable compensation to an

35

injured party; thus, Waldorf bears a heavy burden to demonstrate that the jury's award cannot stand. In attempting to meet this burden, Waldorf relies on a comparison of the verdict here with those in other cases. Although each case involves its own set of facts and circumstances, a review of awards in similar cases serves as a helpful guide in determining the reasonableness of a particular award. See Motter, 883 F.2d at 1230.

Waldorf primarily relies on two cases to demonstrate the inadequacy of his award: Harrigan, 406 N.W.2d at 917 (award of $12,000,000); and Firestone, 693 S.W.2d at 99 (award of $15,000,000). In Firestone, the Missouri Supreme Court upheld a $15,000,000 verdict to a 34-year old quadriplegic, Sally Firestone, as fair and reasonable. However, this award included a recovery for medical expenses and lost earnings, as well as for pain and suffering. See 693 S.W.2d at 109. In fact, testimony showed that the medical expenses and lost earnings totaled $7,076,771. See id. Thus, the verdict in Firestone is difficult to compare to the verdict for pain and suffering here. Furthermore, as the district court noted, Waldorf 's injuries do not seem as severe as those Firestone suffered. As a result of the collapse of a skywalk, she became a C-5 quadriplegic and she had no movement below her shoulder level, except for some use of her bicep muscles. Among other injuries and problems, she also lost 80 percent of her blood, which necessitated "massive blood transfusions." Id. at 108. Firestone also broke both of her legs, and doctors implanted an intercranial monitoring device in her skull. Furthermore, she underwent surgery to stabilize her neck; she had a tracheotomy; and she needed a respirator to breath. Following surgery, Firestone developed bladder infections, pneumonia, and gastric hemorrhage. See id. at 109. Both her neurosurgeon and doctor testified that her injuries were the worst they ever had seen. See id. Thus, because the verdict included factors beyond pain and suffering and because Firestone's injuries seem to have been more severe than Waldorf 's, the verdict in Firestone is not particularly instructive here.

Similarly, the facts underlying the verdict in Harrigan are different from those in this case. In Harrigan , the Court of

36

Appeals of Michigan upheld a jury verdict of $12,000,000 for a plaintiff who suffered from a C6–C7 quadriplegia injury. However, like the verdict in Firestone , this verdict does not specify that it was simply for pain and suffering; instead, this award seems to include medical expenses and other economic losses. Thus, the Harrigan verdict cannot reasonably be compared to the award in this case.

As further support for his contention that the pain and suffering verdict was inadequate, Waldorf cites a number of cases awarding between $6,000,000 and $14,000,000 for pain and suffering by individuals who became quadriplegics as a result of an accident. See, e.g., Peterson v. Goodyear Tire & Rubber Co., No. 90L15224, 1995 WL 537039 (Ill. Cir. Ct. 1995) (awarding $6,000,000 for pain and suffering to an individual who became a quadriplegic as a result of a tire failure); Roster v. Moulton, No. 88–10164, 1994 WL 873739 (Fla. Cir. Ct. 1994) (awarding $10,000,000 for pain and suffering to an individual who became a quadriplegic when struck by a car); Martin v. Dellwood Foods Inc. , No.10090/90, 1991 WL 453940 (N.Y. Sup. Ct. 1991) (awarding $14,000,000 for pain and suffering to an individual who became a quadriplegic as a result of an accident).

Notwithstanding these cases, we cannot hold that the district court abused its discretion in denying a new trial based on the size of the pain and suffering verdict. As the district court correctly noted, a significant number of other cases have resulted in verdicts originally or as remitted for substantially less for pain and suffering for similar injuries than the verdicts Waldorf cites. See, e.g., Heitzenrater v. United States, 930 F.2d 33 (10th Cir. 1991) (table) (reducing an award for pain and suffering to $1,000,000 for a psychiatric patient who fell seven stories and became a quadriplegic); Moore v. Subaru of Am., 891 F.2d 1445 (10th Cir. 1989) (awarding $1,500,000 for pain and suffering and medical expenses to an individual rendered a quadriplegic as a result of an automobile accident); Denham v. United States, 834 F.2d 518 (5th Cir. 1987) (upholding as adequate an award of $500,000 for pain and suffering of an individual with quadriplegia as a result of a diving accident); Siverson v. United States, 710 F.2d 557 (9th Cir.

37

1983) (upholding an award of $1,000,000 for pain and suffering for a man who became a C6–C7 quadriplegic); Dawson v. Chrysler Corp., 630 F.2d 950 (3d Cir. 1980) (upholding an award of $2,064,863 for expenses and for pain and suffering for a man who became a quadriplegic in an automobile accident); see also Waldorf, 916 F. Supp. at 428–29 (listing further examples of similar verdicts). Thus, as these cases demonstrate, individuals rendered quadriplegics as a result of accidents have received significantly lower awards for pain and suffering than the award to Waldorf in this case.

We also note that a very recent New Jersey state court case lends support to the district court's refusal to order a new trial on damages. In Green v. General Motors Corp., No. A–5756–95T2, 1998 WL 116851, ___ A.2d ___ (N.J. Super. Ct. App. Div. Mar. 18, 1998), the court heard an appeal from a case which in some respects is remarkably similar to this case. In Green, a 24–year old man was rendered a quadriplegic in an accident on June 9, 1986. Thus, in Green, the accident was less than four years after the accident here and the injured party was the same age as Waldorf at the time of the injury. In Green, the jury awarded $4,000,000 for pain and suffering. While the parties in Green raised numerous issues in the appeal and cross appeal, they did not challenge the pain and suffering award. Of course, the Green verdict was considerably higher than that in this case. Yet the case demonstrates that even in these times in which we have grown accustomed to extremely high verdicts, a jury in New Jersey in a similar case has returned a verdict for pain and suffering for what some persons might think was a modest amount.

In sum, the wide range of damages awarded in the cases brought to our attention demonstrates the inexact nature of juries' assessments of damages and the difficulty in using other cases as a comparison to test the adequacy of a particular award. Although Waldorf suffered catastrophic injuries as a result of the accident, the award of $2,500,000 for pain and suffering does not seem shockingly inadequate. The determination of an appropriate award for pain and suffering is inherently subjective, and nothing in

38

the record indicates that the jury failed to evaluate the evidence in a fair and reasonable manner. Even though the award was for less than what Waldorf sought or what other plaintiffs may have received in other somewhat comparable cases, and indeed may have been less than we would have awarded if we made a de novo damages determination in this case, the award was within permissible limits for pain and suffering even for the devastating injuries which Waldorf suffered. In truth, it is very difficult to equate money with an injury of the character involved here. Thus, we hold that the district court did not abuse its discretion in denying the request for a new trial based on the amount of the verdict for pain and suffering.

C. Award for Past and Future Economic Loss

Waldorf also challenges the jury's award of $195,000 for past lost earnings and $391,500 for future lost earnings as inadequate on four principal grounds: (1) insufficient evidence existed for the jury to determine that Waldorf failed to mitigate his damages; (2) the district court improperly qualified a witness as an expert; (3) counsel for the Borough made a number of improper references regarding a witness during the course of the trial; and (4) counsel for the Borough made an improper statement during his closing argument that misled the jury. We will consider each of these arguments in turn.

1. Mitigation of Damages

At trial, Conrad Berenson, an economist, testified on behalf of Waldorf that he would have earned $316,552 from the date of the accident to the time of trial, based on the assumption that he would have left college as of the time of the accident.[8] Dr. Berenson concluded that Waldorf 's
_____

8. Dr. Berenson based his earnings loss analysis on the earning potential of an individual with one to three years of college education. He used the analysis not only to calculate past earnings loss, but also to determine future earnings loss. Counsel for Waldorf pursued this strategy as a result of an earlier ruling from this court. See Waldorf, 896 F.2d at 742–43 (holding that it was an error for Waldorf to have presented testimony about future earnings based on attorney's salary).

future earnings would have ranged between $1,221,000 and $1,339,000, based on an assumption that he would have worked until age 65. Therefore, the total earnings loss was between $1,537,000 and $1,655,000. The Borough did not introduce its own economic expert to counter this calculation.

The jury awarded Waldorf a total of $586,500 for past and future earnings loss, most likely on the basis that Waldorf failed to mitigate his damages.[9] Waldorf argues, however, that the jury did not have sufficient evidence to determine that Waldorf failed to mitigate his damages.

At trial, the parties disputed whether Waldorf could work in spite of his injuries. A number of witnesses testified that only between 15 to 30 percent of all quadriplegics are able to return to work. See app. at 170–71, 238, 329. However, as the district court correctly noted, the jury heard testimony from some of these witnesses that Waldorf was capable of working. See Waldorf, 916 F. Supp. at 429. For instance, Waldorf 's own expert, Dr. Ragnarsson, who was a treating physician, agreed that Waldorf could return to work. On direct examination, Dr. Ragnarsson acknowledged that "technically [Waldorf] could hold a sedentary job of some sort." App. at 169. On cross-examination, he further testified: "I believe that he [Waldorf] can work." Id. at 172.

Additionally, Waldorf 's vocational expert, Dr. David B. Stein, provided testimony that supported a conclusion that Waldorf had not mitigated damages. Dr. Stein administered aptitude and achievement tests to Waldorf, and based on the results, determined that he was a bright man with the ability to learn and with an intelligence in the high average range. See id. at 328. On cross-examination, Dr. Stein testified that he knew of no reason why Waldorf could not take college courses. See id. at 330. Based on this evidence, the district court held that the award for past and future lost earnings was not inadequate, even though it was well below Dr. Berenson's figures. See id.

_____

9. Of course, it is possible that the jury simply did not accept Dr. Berenson's testimony as to Waldorf 's anticipated loss of earnings. We nevertheless focus on the mitigation point.

We hold that the district court did not abuse its discretion in denying Waldorf 's motion for a new trial based on the asserted inadequacy of the verdict for past and future lost earnings. Although there was testimony that most quadriplegics cannot return to work after their injuries, the most relevant evidence here was the testimony regarding Waldorf 's ability to return to work. Based on the specific testimony regarding Waldorf 's own abilities and the jurors' opportunity to assess the credibility of the witnesses, the jury reasonably could have determined that Waldorf failed to mitigate his damages by not working.10

The jury awarded Waldorf $121,552 less in past earnings and $829,500 less in future earnings than the lowest figures provided by Dr. Berenson. But the jury heard evidence that Waldorf potentially could earn anywhere from $15,000 to $100,000 a year even with his injuries. See app. at 220–31. Thus, even if the jury accepted Dr. Berenson's basic figures, it could have reduced the award predicated on Waldorf 's failure to mitigate damages. Accordingly, the verdict it returned was justified by his ability to generate earnings as demonstrated at trial. The future earnings award is $29,625 a year less than Dr. Berenson's calculation; and the past earnings award averages $9,350 a year less.11 Yet these reductions are not grossly out of line when the evidence regarding the job opportunities available to Waldorf is considered. Therefore, because the jury had sufficient evidence to consider the issue of mitigation and the ultimate award was not unreasonable, we hold that the district court did not abuse its discretion in determining that the jury's award was adequate and in denying Waldorf 's motion for a new trial.

_____

10. We are assuming without actually knowing that the jury found that Waldorf failed to mitigate his damages by not working.

11. Even making a reasonable assumption that Waldorf did not begin working until well after the accident, the reduction by the jury based on a failure to mitigate his damages with regard to the past earnings award is not so unreasonable as to warrant a new trial. For instance, if the same $29,625 yearly figure presumably used to reduce the future lost earnings award is used to examine the past lost earnings award, the jury reduced Waldorf 's award for a failure to mitigate only over approximately the past four years. Given the length of time since the accident, to require mitigation over such a short time period is not unreasonable.

As we indicated above, Waldorf also sought an additur from the district court. However, inasmuch as we conclude that the court did not abuse its discretion in denying Waldorf 's motion for a new trial based on the asserted inadequacy of the verdict, the district court had no reason to grant an additur. In the circumstances we do not address the additur issue further.

## 2. Qualification of Dennis Rizzo

Waldorf also argues that he should receive a new trial because the district court improperly qualified Dennis Rizzo, who testified for the Borough at trial, as an expert witness on vocational rehabilitation. Under the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. Waldorf does not dispute that vocational rehabilitation is a proper subject for expert testimony; instead, he questions whether Rizzo was qualified to testify as an expert in that area. For a court to qualify a witness to testify as an expert, Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." American Tech. Resources v. United States, 893 F.2d 651, 656 (3d Cir. 1990); Hammond v. International Harvester Co., 691 F.2d 646, 653 (3d Cir. 1982) ("[U]nder Rule 702, an individual need possess no special academic credentials to serve as an expert witness. . . .`[P]ractical experience as well as academic training and credentials may be the basis of qualification (as an expert witness).' " (citation omitted)). We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." See, e.g., In re Paoli R.R. Yard PCB Litig., 35 F.3d

717, 741 (3d Cir. 1994). However, "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . ." Aloe Coal Co. v. Clark Equip. Corp., 816 F.2d 110, 114 (3d Cir. 1987).

Even though we apply Rule 702 liberally, we have not pursued a policy of qualifying any proffered witness as an expert. For instance in Aloe Coal Co., we held that a district court abused its discretion in allowing a tractor sales representative to testify as an expert regarding the cause of a tractor fire. In making this determination we stated:

> Drewnoski [the expert witness] was not an engineer. He had no experience in designing construction machinery. He had no knowledge or experience in determining the cause of equipment fires. He had no training as a mechanic. He never operated construction machinery in the course of business. He was a salesman, who at times prepared damage estimates.

816 F.2d at 114 (citations omitted). Therefore, we held that the witness was not sufficiently qualified to give an expert opinion on the issue of causation.

Numerous district court opinions within this circuit provide examples of witnesses disallowed from providing expert testimony. For example, in Diaz v. Johnson Matthey, Inc., 893 F. Supp. 358, 373 (D.N.J. 1995), the plaintiff alleged that working conditions at his former job caused him to develop platinum salt allergies. In support of this allegation, the plaintiff produced a doctor who sought to testify about his condition and the possible long-term health effects of the condition. The district court held that the doctor was not qualified to testify that the plaintiff had a platinum salt allergy because his experience with such patients was limited and he had only a limited familiarity with the literature regarding the illness. See id.; see also Higgenbotham v. Volkswagenwerk Anktiengesellschaft , 551 F. Supp. 977, 982–83 (M.D. Pa. 1982) (holding that an investigating officer was not qualified to offer an expert opinion regarding the movement of a person inside a vehicle during an accident because the officer only had minimal training in accident reconstruction, physics, and the movement of bodies), aff 'd, 720 F.2d 662 (3d Cir. 1983)

43

(table); Globe Indem. Co. v. Highland Tank & Manuf. Co., 345 F. Supp. 1290, 1291–92 (E.D. Pa. 1972) (holding that neither an electrical engineer nor an industrial hygienist was qualified to testify as an expert regarding the design of a molasses storage tank where neither had any experience or knowledge in the field of storage tank design), aff 'd, 478 F.2d 1398 (3d Cir. 1973) (table).

However, in considering the qualification of witnesses as experts, we stress that ordinarily an otherwise qualified witness is not disqualified merely because of a lack of academic training. For instance, in Hammond the district court determined that a witness could testify as an expert regarding a rollover protective structure on a tractor even though he did not have a formal degree in engineering or physics. See 691 F.2d at 653. In spite of his lack of formal training, the witness had experience in the field, because he worked selling automotive and mechanical equipment, including agricultural equipment, and he taught automobile repair and maintenance at a high school. We upheld his qualification as an expert, stressing that his practical experience was sufficient. See id.

Furthermore, in Knight v. Otis Elevator Co., 596 F.2d 84, 87–88 (3d Cir. 1979), we held that an engineer who had designed safety equipment could testify as an expert regarding whether unguarded elevator control buttons were a design defect, even though he had no experience with such devices on elevators. We held that the expert's generalized knowledge about machine safety sufficiently qualified him as an expert. See also Davis v. United States, 865 F.2d 164, 168 (8th Cir. 1988) (permitting the testimony of a public health investigator regarding the probabilities of transmitting gonorrhea despite his lack of medical training, because the expert had practical experience regarding such cases); Circle J Dairy, Inc. v. A.O. Smith Harvestore Prod., Inc., 790 F.2d 694, 700 (8th Cir. 1986) (holding that a witness could testify as an expert regarding the feed-related health problems of dairy cattle despite a lack of academic qualifications because of his practical experience in the area).

The district court qualified Rizzo to testify as a vocational expert in spite of his lack of any formal training in that

44

field, and notwithstanding that his educational training culminated in a master's degree in sociology and social organization from Rutgers University in 1973. But his experience was sufficient to qualify him as an expert. After obtaining his degree, Rizzo began working for the State of New Jersey in the Division of Mental Retardation as a social worker. He worked as a case manager assisting mentally retarded individuals in "meeting their life needs" and assisting families in meeting the life needs of their mentally retarded children. See app. at 207–08. From 1980 to 1983, Rizzo operated a non-profit corporation whose purpose "was to expand the availability of services in the community to individuals with disabilit[ies]." Id. at 208. From 1983 to 1986, Rizzo was employed in a marketing job selling consumer products on college campuses. In 1986, Rizzo was unemployed for nine months, but then began to work as a social worker at the North Princeton Developmental Center. He soon became a supervisor of an 80 to 84 bed care unit which housed individuals "who had severe mobility impairment, severe psychiatric involvement,[and] a variety of different disabilities . . . ." Id. at 210. He worked in this facility for four years.

In 1990, Rizzo began working for the State of New Jersey in the Developmental Disabilities Council as a contract manager. In 1991, he became involved in the Council's administration of a million dollar loan pool to assist disabled New Jersey residents in starting their own businesses. See id. at 210–11. In that capacity, Rizzo evaluated the capacity of disabled individuals to accomplish specific employment opportunities. Rizzo also testified that, through the course of his employment, he became familiar with studies on the work that quadriplegics can perform. See id. at 219. Furthermore in his job experience, Rizzo utilized the New Jersey Department of Labor Statistics and the New Jersey Job Listing Book, which indicate employment opportunities available in various job categories in New Jersey. See id. at 229, 343. Thus, based on his experience and his familiarity with the literature in the field, the district court held that Rizzo was qualified properly as a vocational expert. The court said that"[w]hile his formal credentials may be a little thin, he certainly had sufficient substantive qualifications to be considered an

45

expert under the liberal standard of Rule 702." Waldorf, 916 F. Supp. at 430.

Waldorf has a heavy burden in challenging this decision because, absent an abuse of discretion, we will not substitute our own judgment for that of the trial court regarding the admission or exclusion of expert testimony. See Aloe Coal Co., 816 F.2d at 114. Of course, an abuse of discretion means much more than that the appellate court disagrees with the trial court. Rather, a trial court's determination whether to admit or exclude expert testimony will be upheld "unless manifestly erroneous." Id.

We hold that the district court did not abuse its discretion in qualifying Rizzo as an expert witness. Even though Rizzo did not possess formal academic training in the area of vocational rehabilitation, he did have experience in the field through his employment at the Developmental Disabilities Council in attempting to provide jobs for disabled individuals. During this time, Rizzo also became familiar with the relevant literature in the field. Even if his qualifications are, as the district court described, "a little thin," he has substantially more knowledge than an average lay person regarding employment opportunities for disabled individuals. In the circumstances, we cannot say that the district court abused its discretion in determining that Rizzo possessed the minimum qualifications necessary to testify as an expert.

Whatever doubts the district court might have had regarding Rizzo's qualifications, it is important to note that "[o]nce the trial court has determined that a witness is competent to testify as an expert, challenges to the expert's skill or knowledge go to the weight to be accorded the expert testimony rather than to its admissibility." Fox v. Dannenberg, 906 F.2d 1253, 1256 (8th Cir. 1990); see also Knight, 596 F.2d at 88. The jury heard all of the testimony regarding Rizzo's qualifications, and thus the jurors could evaluate the weight to give to Rizzo's expert opinions. Therefore, because the district court did not abuse its discretion in qualifying Rizzo as an expert witness, we will uphold its denial of Waldorf 's motion for a new trial.12 In

_____

12. Waldorf also contends that Rizzo had no basis to testify about rehabilitation technology available in Florida where Waldorf now resides.

short, this situation is one within the discretion of the court. Thus, while we do not doubt that we would not have disturbed the court's ruling if it had excluded Rizzo as an expert witness, we cannot disturb the court's ruling qualifying him. As is so often the case in discretionary rulings involving qualification of witnesses or admission of evidence, we will affirm a reasoned decision by a district court regardless of how we might have decided the issue if we had been making the original determination.

3. Remarks of Defense Counsel in Summation

As another basis for a new trial, Waldorf asserts that the defense counsel made an improper argument during his closing remarks. During his closing argument, counsel for the Borough stated that Waldorf would be able to obtain free job training for the rest of his life, a service that counsel termed "occupational therapy." See  app. at 243. However, earlier in the trial, Dr. Ragnarsson had stated that this term did not pertain to job training, but rather referred to training in activities of daily living. See Waldorf, 916 F. Supp. at 432. Waldorf alleges that the Borough's misuse of the term "occupational therapy" led the jury to award less in economic damages than it otherwise would have awarded. In addressing this argument, the district court noted that even though the use of the term by the Borough was "sloppy and incorrect," it did not unduly prejudice the jury. Id.

"Our standard of review with respect to the award of a new trial for prejudicial conduct by counsel is deferential.

_____

The district court determined that Rizzo properly based this testimony on a letter he received from a vocational expert in Florida. See Waldorf, 916 F. Supp. at 431. Under the standards for expert testimony, Rizzo was not required to have personal knowledge regarding every job opportunity available. "[A]n expert opinion may be based on any type of evidence commonly used by experts in the field." Rogers v. Raymark Indus., Inc., 922 F.2d 1426, 1429–30 (9th Cir. 1991); see also  Fed. R. Evid. 703. Because Rizzo based his testimony on a reliable source in the field of vocational rehabilitation, the district court did not err in permitting Rizzo
to testify regarding rehabilitation technology in Florida.

47

. . . Because the trial judge was present and able to judge the impact of counsel's remarks, we defer to his assessment of the prejudicial impact." Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 207 (3d Cir. 1992). We hold that the district court did not abuse its discretion in denying a new trial based on the Borough's counsel's remarks. Courts generally have given attorneys great latitude in their arguments; we have held that "not all improper remarks will engender sufficient prejudice to mandate the granting of a new trial. Our test is whether the improper assertions have made it `reasonably probable' that the verdict was influenced by prejudicial statements." Id.  at 208 (citations omitted). Although counsel for the Borough admittedly misused the term "occupational therapy," the idea behind his argument did have a basis in the record.

The Borough introduced testimony that Florida, where Waldorf now lives, and New Jersey, both offer rehabilitation service systems that assist disabled individuals to locate jobs through the administration of aptitude tests, the provision of job locators, and the adaptations of workplace environments. All of these services are government funded. See app. at 344-45. Therefore, the Borough's counsel had a basis in the record to argue that Waldorf had free services available to assist him in locating a job, even though the specific term the Borough used to describe such services was incorrect. We hold that the district court did not abuse its discretion in denying a new trial based on this minor misstatement by the Borough's counsel, because it is not "reasonably probable" that this misstatement influenced the verdict. Indeed, the comment seems inconsequential in the overall context of this case.

4. Improper Use of the Testimony of James Pascuiti

As a further basis for a new trial, Waldorf alleges that the Borough misused the testimony of its vocational expert, James Pascuiti, who is also a quadriplegic, by improperly trying to compare Pascuiti to Waldorf. Waldorf complains of two specific instances: (1) during Pascuiti's testimony, counsel for the Borough questioned him about his wedding ring; and (2) during the Borough's closing argument, counsel for the Borough improperly compared Pascuiti to

48

Waldorf. These allegations also involve potentially improper behavior by counsel; therefore we review the district court's decision denying a new trial by reason of them under an abuse of discretion standard. See Fineman, 980 F.2d at 207.

a. Redirect Examination of Pascuiti

At the conclusion of his redirect examination of Pascuiti, counsel for the Borough posed the following question: "Just one last question: What is that ring you are wearing on your left hand?" App. at 241. Before Waldorf 's counsel could object, Pascuiti responded: "[A] wedding band." Id. After Waldorf 's counsel objected, the district court "promptly issued a curative instruction. It said:`I ask the jury to disregard whether he wears a wedding band is immaterial to the case . . . I specifically instruct you whether this witness wears a wedding band is wholly irrelevant to the issues in this case.' " Waldorf, 916 F. Supp. at 431. Based on this immediate instruction, the district court held that the remark did not prejudice Waldorf, and did not confuse the jury. See id.

We hold that the district court did not abuse its discretion in holding that this remark did not influence the jury unduly. The district court immediately issued an instruction to the jury to disregard the question and the answer. The court also repeated this instruction to the jury during its charge, and told it not to use the reference in any way to decide the case. See app. at 348. Thus, although this irrelevant exchange occurred between counsel for the Borough and Pascuiti, the district court did not abuse its discretion in holding that its curative instructions were sufficient to prevent any prejudice to Waldorf. After all, there is no reason to believe that the jury did not follow the instructions. See United States v. Gilsenan, 949 F.2d 90, 96 (3d Cir. 1991).

b. Closing Argument by the Borough

Waldorf also maintains that the Borough's counsel improperly compared Waldorf and Pascuiti in his

closing argument by repeatedly describing Pascuiti's accomplishments after he became a quadriplegic. While playing football in high school in 1963, Pascuiti became a C6-C7 quadriplegic, the same injury that Waldorf suffered. In 1964, Pascuiti enrolled in Seton Hall University where he received a bachelor's degree in 1968. He received a master's degree from the same school in 1971, and later became certified as a rehabilitation counselor. See app. at 244-46. During his closing argument, counsel for the Borough referred to these facts in the context of Waldorf 's failure to seek any kind of employment or schooling following his accident. However, because Waldorf did not object to these remarks when they were made, the district court held that Waldorf had waived any objection to them. Furthermore, the court stated that even if Waldorf had objected, it would have permitted the statements, because "[t]he Borough was simply restating information that had already been presented to the jury." Waldorf, 916 F. Supp. at 431.

As the district court correctly noted, it is clear that a party who fails to object to errors at trial waives the right to complain about them following trial. See Murray v. Fairbanks Morse, 610 F.2d 149, 152 (3d Cir. 1979) (holding that "[c]ounsel's failure to object precludes him from seeking a new trial on the grounds of the impropriety of opposing counsel's closing remarks."). Waldorf failed to object at trial; therefore, we hold that the district court did not abuse its discretion in denying Waldorf 's motion for a new trial.13

V. COLLATERAL SOURCE SET-OFF

In its cross appeal, the Borough argues that the district court misapplied New Jersey law and improperly limited the amount of a collateral source set-off to which it was entitled. Under the New Jersey Tort Claims Act:

    If a claimant receives or is entitled to receive benefits
_____

13. The Borough contends that the district court improperly excluded certain evidence but it raises this issue only in the event that we otherwise grant a new trial as it asks us to uphold the damages verdict. Thus, we do not consider this point further.

50

> for the injuries from . . . any other source . . . such
> benefits shall be disclosed to the court and the amount
> thereof which duplicates any benefit contained in the
> award shall be deducted from any award against a
> public entity . . . .

N.J. Stat. Ann. S 59:9-2(e) (West 1992). As part of the Tort Claims Act, this section applies to cases involving public entities in New Jersey. Although the Tort Claims Act was intended to establish a structure to control the liability of public entities, the purpose behind this particular section is "to prohibit the receipt of duplicate benefits by a claimant filing suit under the act." Section 59:9-2(e) cmt. Since his accident, Waldorf has received social security disability benefits. The Borough maintains that under section 59:9-2(e) it not only should obtain a set-off for these amounts already received by Waldorf, but also should obtain a set-off for any social security disability payments that Waldorf will receive in the future.

In an order dated October 10, 1996, the district court granted the Borough's motion seeking a set-off against the jury's award in the amount of $80,559, which "represents the amount of social security disability benefits paid to Plaintiff from the date of the accident to the present date." App. at 36. However, the district court denied the Borough's motion for a set-off for future social security disability benefits that Waldorf might receive. The Borough contends that this limitation on the set-off was improper under section 59:9-2(e). Because the district court's decision rested on its construction of section 59:9-2(e), our review of the decision is plenary. See, e.g., Smith, 124 F.3d at 460-61.

In deciding questions of state law, we look to the decisions of courts of that state for guidance. See, e.g., Hahnemann Univ. Hosp. v. Edgar, 74 F.3d 456, 462-65 (3d Cir. 1996). Although New Jersey courts have acknowledged that social security benefits are a potential collateral source payment subject to set off under N.J. Stat. Ann.S 2A:15-97 (West Supp. 1997), applicable in general in personal injury and wrongful death actions, see, e.g., Thomas v. Toys `R Us, Inc., 660 A.2d 1236, 1244 (N.J. Super. Ct. App. Div. 1995), we are not aware of any court in New Jersey which has

51

addressed directly the issue of the set-off of future social security disability benefits under section 59:9-2(e) in a published opinion. Section 2A:15-97, like section 59:9-2(e), provides for collateral source set-off for any monies or benefits that a plaintiff "receives or is entitled to receive . . . ." The purpose behind this section is the same as section 59:9-2(e): to eliminate double recoveries by plaintiffs. See N.J. Assembly Insurance Comm. Statement, L. 1987, c. 326, S 1, N.J. Senate No. 2708 (Sept. 1, 1987); Senate Judiciary Comm. Statement, L. 1987, c. 326S 1, N.J. Senate No. 2708 (Oct. 30, 1986); Sponsor Statement, L. 1987, c. 326, S 1, N.J. Senate No. 2708 (Oct. 27, 1986). Because the collateral source provisions are so similar and the purposes behind the two sections are the same, we can infer from New Jersey courts' interpretation of section 2A:15-97 what the proper interpretation of section 59:9-2(e) should be.

The leading case applying the collateral source set-off of future social security benefits under section 2A:15-97 is Parker v. Esposito, 677 A.2d 1159 (N.J. Super. Ct. App. Div. 1996). In Parker, a pedestrian who was struck by a van received an award in court that included an amount for past and future lost income. The Appellate Division considered whether the court should set off his future social security disability payments as a collateral source under section 2A:15-97. The court held that this section required that the court deduct future benefits from the judgment, because the statute clearly requires the deduction of benefits that the plaintiff "is entitled to receive." Parker, 677 A.2d at 1162. Furthermore, such a deduction was warranted because "[t]he statute's purpose is to prevent double recovery, thereby giving some relief from the increasing costs of liability insurance." Id.

The court stressed, however, that a "plaintiff 's entitlement to future benefits must be determined and fixed when judgment is entered on the verdict." Id. These benefits are those to which a "plaintiff has an established, enforceable legal right when judgment is entered and which are not subject to modification based on future unpredictable events or conditions. In other words, future collateral benefits are deductible only to the extent that

52

`they can be determined with a reasonable degree of certainty.' " Id. at 1162-63 (quoting Buchman v. Wayne Trace Local Sch. Dist., 652 N.E.2d 952, 958 (Ohio 1995)). Applying this rule, the Parker court recognized that "there was substantial evidence at trial that plaintiff can be gainfully employed, though not at the salary he earned prior to the injury." Id. at 1163. Thus, the court determined that the plaintiff 's social security payments were uncertain and not determinable at the time of judgment, because of such factors as "his [future] condition or[potential] employability." Id. Consequently, it did not allow the set-off for them.

Applying this precedent here, we conclude that the district court did not err in determining that the Borough was not entitled to a set-off for future social security benefits that Waldorf might receive. Social security disability payments are available only to individuals who, because of a disability, are not capable of working. See 42 U.S.C. S 423(a) (providing that certain individuals who are disabled are entitled to benefits); see also  42 U.S.C. S 423(d) (defining "disability" as impairments that "are of such severity that he is not only unable to do his previous work but cannot" do certain other work). Furthermore, section 423(f) provides that a recipient of social security disability benefits may have those benefits terminated if substantial evidence demonstrates that "[a]lthough the individual has not improved medically, he or she is nonetheless a beneficiary of advances in medical or vocational therapy . . . and [t]he individual is now able to engage in substantial gainful activity" or if such evidence demonstrates that "[a]lthough the individual has not improved medically, he or she has undergone vocational therapy (related to the individual's ability to work), and [t]he individual is now able to engage in substantial gainful activity . . . ." 42 U.S.C. S 423(f). Thus, the social security statute clearly provides that disability benefits can be terminated if a recipient does not remain under a disability that prevents him from working.

The Borough presented the expert testimony of Rizzo and Pascuiti, both of whom testified that Waldorf is capable of obtaining and holding employment. In addition, Waldorf 's

53

own experts agreed that Waldorf was capable of working. In light of this testimony, as the court held in Parker with respect to the plaintiff there, we hold that it is uncertain whether Waldorf will continue to receive his disability benefits. Therefore we will affirm the district court's determination that the Borough may receive a set-off only in the amount of $80,559.14

VI. CONCLUSION

Having determined that we have jurisdiction over the present appeal and cross appeal, we will affirm the orders of the district court and uphold the judgment in favor of Waldorf. In particular, the district court did not abuse its discretion in determining that the award was not unreasonably low. Furthermore, the district court did not abuse its discretion in denying Waldorf 's motion for a new trial based on the jury's consideration of mitigation evidence, the qualification of Rizzo as an expert, or the conduct of opposing counsel. We also hold that the district court did not abuse its discretion in binding the Borough to the stipulation it entered into prior to the second trial, nor did the district court err in fixing the collateral source set-off that the Borough could receive.

Although the judgment in this case might not have met Waldorf 's expectations, and, indeed, may have been less than we would have awarded if we had fixed the damages de novo on the basis of the record, it will provide a small

_____

14. We also reject the Borough's argument that the appropriate date for determining when such benefits are fixed and determinable should not have been the date of the district court's order regarding this issue, but rather should be fixed as of the date that this litigation finally concludes,
presumably when a final verdict is rendered in the liability trial. As we have stated in this opinion, the Borough does not have any remaining claims or defenses against Waldorf to advance in any future liability trial, and the judgment against the Borough is final. The district court cannot and should not retain jurisdiction over Waldorf 's claim against the Borough merely to continue to deduct collateral source set-off benefits. The aspect of this litigation with respect to the Borough's liability to Waldorf should be at an end even if the case otherwise continues. Therefore, we reject the Borough's argument for a continuing set-off.

54

measure of comfort for the horrific injuries that he received
over 15 years ago, and it also will represent some measure
of closure to this legal odyssey that began over 13 years ago.15

For the foregoing reasons, we will affirm the orders of the
district court.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

15. We understand that as of this time only the liability of the Borough
has been fixed. In response to our inquiry at oral argument, counsel for
the Borough indicated that this litigation will go on with respect to
fixing
responsibility among the defendants. Yet we cannot help but wonder
whether now that the overarching issues in this case are resolved, the
parties cannot settle the remaining issues so that this litigation which
is
over 13 years old can be ended.